**Rapidigm Inc. v. ATM Management Services LLC**

*Robert M. Linn, Mark A. Grace* and *Alyze L. Pierce*, for plaintiff.

*Kurt A. Miller, David G. Ries* and *Ashlie T. VanMeter*, for defendant.

WETTICK JR., *J.*, July 10, 2003—This lawsuit arises out of a contract between plaintiff (Rapidigm) and defendant (ATM). The preliminary objections of Rapidigm seeking dismissal of tort claims that ATM has raised in an amended counterclaim are the subject of this opinion and order of court. These preliminary objections raise the issue of whether a professional negligence action may be maintained against a computer consultant.

On July 17, 2001, Rapidigm and ATM entered into a written project services agreement under which Rapidigm was to provide information technology consulting services. The agreement provided for ATM to pay a fixed amount for the services provided for under the agreement and for services beyond the scope of the agreement to be billed on a time and material basis. In this lawsuit, Rapidigm seeks to recover money due for services performed under the agreement and additional money for work performed beyond the scope of the agreement. In its answer, ATM alleges that Rapidigm is not entitled to any additional money because of its failure to perform the work in accordance with the requirements of the contract.

ATM's answer includes an eight-count amended counterclaim in which it seeks to recover various damages including costs it incurred to locate and retain a replacement computer services provider and costs it will incur to complete the project in accordance with general industry standards. This amended counterclaim includes

causes of action based on breaches of the project services agreement, including breach of an express written warranty that all services provided by Rapidigm will be performed in accordance with the general standards of the industry. The amended counterclaim also includes the following causes of action which Rapidigm's preliminary objections seek to dismiss: fraud, misrepresentation, and professional negligence.

As I will discuss, the professional negligence and other causes of action that are the subject of Rapidigm's preliminary objections are generally based on the same conduct that serves as the basis for ATM's breach of contract/breach of warranty claims. ATM seeks to pursue these additional causes of action based on tort law (and Rapidigm seeks their dismissal) because these tort law causes of action may provide additional remedies.

The written warranty on which ATM's breach of warranty claim is based includes a provision that this express warranty is in lieu of all other express or implied warranties and that in no event will Rapidigm be liable to the purchaser for any amount in excess of the fees paid hereunder. (Complaint, exhibit A ¶10) The parties' agreement also includes a limitation of liability provision (complaint, exhibit A ¶12) which provides that neither party shall be liable for special, indirect, or consequential damages. Also, under Pennsylvania case law claims for punitive damages may not be based on the breach of a contract. *Johnson v. Hyundai Motor America,* 698 A.2d 631, 639 (Pa. Super. 1997).

In the tort causes of action, ATM seeks compensatory damages that substantially exceed the payments ATM made to Rapidigm, and punitive damages based on fraud.

## I.

ATM's fraud and misrepresentation claims are based on similar allegations. The July 17, 2001 project services agreement provided for ATM to pay Rapidigm a fixed amount of $706,200 for the services within the scope of the agreement.[1] ATM alleges that Rapidigm drastically underbid the project. Rapidigm quoted ATM a cost of $706,200 with the knowledge that it would not perform the project for that amount. Its intention was to induce ATM to retain Rapidigm, thereby enabling Rapidigm to begin performance of the project and making ATM dependent upon Rapidigm personnel to complete the project. This would permit Rapidigm to demand substantially more money from ATM in order to complete the project. Furthermore, while ATM represented that the payment of $706,200 would purchase the type, amount, and content of work needed to provide ATM with a new software system, Rapidigm fraudulently omitted from its bid additional work not covered under the terms of the agreement that would be required in order to provide ATM with a new software system.[2]

I am sustaining Rapidigm's preliminary objections to ATM's fraud and misrepresentation claims based on the above allegations.

---

1. 25 percent of the contract price was to be paid initially, and additional 25 percent payments were to be made when the project was 33 percent complete, 67 percent complete, and 100 percent complete. ATM made two of the four payments.

2. Before the project was completed, Rapidigm terminated the agreement pursuant to a provision in the agreement allowing either party to terminate upon 30 days notice. ATM alleges that Rapidigm terminated the agreement after ATM refused to pay an additional $1.2 million to complete the project.

Many of ATM's claims are based on fraudulent representations made before the parties executed the project services agreement regarding the work that would be performed and the cost of the work. The project services agreement contains an integration clause (complaint, exhibit A ¶17(f)) which provides that this agreement constitutes the entire agreement between the parties and supersedes any prior or contemporaneous communications, representations, or agreements between the parties, whether oral or written, regarding the subject matter of this agreement. Under Pennsylvania case law, in a commercial transaction the parol evidence rule bars reliance upon any representations made prior to the execution of an agreement containing a broad integration clause. *HCB Contractors v. Liberty Place Hotel Associates,* 539 Pa. 395, 652 A.2d 1278 (1995); *1726 Cherry Street Partnership v. Bell Atlantic Properties Inc.,* 439 Pa. Super. 141, 653 A.2d 663 (1995).

ATM also raises claims based on allegations that at the time the parties executed the project services agreement, Rapidigm had no intention of complying with the terms of the agreement. Pennsylvania case law holds that a fraud/misrepresentation claim may not be based on such an allegation. *Shoemaker v. Commonwealth Bank,* 700 A.2d 1003, 1006 (Pa. Super. 1997).

ATM's fraud/misrepresentation claims may also be based on allegations concerning Rapidigm's wilful noncompliance with its contractual obligations. These claims may be pursued only through a breach of contract action. The gist of the action doctrine bars claims for negligence or fraud in the performance of the contract. *Etoll*

*Inc. v. Elias/Savion Advertising Inc.,* 811 A.2d 10 (Pa. Super. 2002).

## II.

I next consider Rapidigm's preliminary objection seeking dismissal of ATM's professional negligence claim.

Under settled Pennsylvania case law, a client may bring both a contract action and a tort action against a professional based on allegations that he or she failed to provide the client with professional services consistent with those expected of the profession. See *Gorski v. Smith,* 812 A.2d 683, 693-94 (Pa. Super. 2002) (both breach of contract and professional negligence actions may be raised against an attorney who failed to provide professional services consistent with those expected of the profession); *Koken v. Steinberg,* 2003 WL 21206122 (Pa. Commw. 2003) (accountants can be sued in contract and for malpractice for failure to properly provide professional services).

No Pennsylvania courts have applied any of the doctrines barring tort recovery in relationships arising out of a contract (including the gist of the action doctrine), to claims involving a professional's failure to exercise the proper standard of care. Also, the economic loss doctrine does not apply to professional negligence actions where there is privity of contract. See *e.g., Kituskie v. Corbman,* 552 Pa. 275, 714 A.2d 1027 (1998); *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58 (1989); *Liberty Bank v. Ruder,* 402 Pa. Super. 561, 587 A.2d 761 (1991); and *Hoyer v. Frazee,* 323 Pa. Super. 421, 470 A.2d 990 (1984). The application of the gist of the action or the economic loss doctrine to professional negligence causes of action

would be inconsistent with recent case law (see *e.g., Gorski v. Smith, supra*) which gives a broad reading to prior case law allowing a client to bring both breach of contract and professional negligence actions based on the professional's failure to exercise proper skill and care.[3]

Professional negligence actions are recognized under section 299A of the Restatement (Second) of Torts which reads as follows:

"*Section 299A. Undertaking in profession or trade*

"Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities."

ATM contends that the tort of professional negligence applies to any person who undertakes to render services requiring special skill and knowledge. Rapidigm, on the other hand, contends that the tort of professional negligence applies only to services rendered in the practice of a profession governed by licensing requirements, a code of ethics, disciplinary standards, and the like.

To date, the Pennsylvania courts have allowed professional negligence actions to be maintained only against certain licensed professionals.[4] However, the parties did

---

3. *Gorski* involved legal malpractice. Most legal malpractice claims involve only economic losses. Consequently, the application of the economic loss doctrine to legal malpractice would limit clients' causes of action to a breach of contract claim.

4. The Rules of Civil Procedure governing professional liability actions are restricted to attorneys and other persons who are licensed pursuant to an Act of Assembly. Pa.R.C.P. 1042.1.

not cite and the research of my staff did not produce any Pennsylvania appellate court case law that addresses the issue of whether a professional negligence action should be restricted in this fashion.

The decision of whether to restrict professional negligence actions to traditionally-recognized professions or to allow these actions to be brought against any providers of services requiring special skill and training depends on whether parties contracting with service providers should receive the protections of tort law or whether their rights should be governed solely by the terms of their agreement with the service provider.

Where the claims of a party to a contract involve only economic losses, the trend in the law has been to look solely to contract law to determine the scope of the parties' duties and the remedies for a breach of these duties. Courts have been restricting tort law to the protection of persons or property and eliminating its use to extricate a party from a bargain which allocates risks in a manner different from tort law. In 1989, the Pennsylvania Superior Court in *REM Coal Co. Inc. v. Clark Equipment Co.*, 386 Pa. Super. 401, 563 A.2d 128 (1989), adopted the standard adopted by the United States Supreme Court in *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), under which recovery in tort is barred in product liability actions between commercial enterprises where the only damage alleged is to the product itself. The Pennsylvania Superior Court said that Pennsylvania's breach of warranty protections provide a suitable framework for regulating and enforcing the expectations and obligations of the parties as to product performance and that to im-

pose tort liability in addition "would certainly erode the important distinctions between tort and contractual theories, including their differing objectives." *REM Coal,* 386 Pa. Super. at 411, 563 A.2d at 133. In 2002 in *Etoll Inc. v. Elias/Savion Advertising, supra,* the Pennsylvania Superior Court, in a case of first impression, ruled that the gist of the action doctrine applies to claims for fraud in the performance of a contract.[5] If the policy of protecting the allocation of risks is sufficiently important to defeat product liability and fraud claims, there is no apparent reason why contracts with providers of specialized services should not also be governed solely by contract law.

The apparent purpose of professional negligence actions is to provide protection to those service providers who are not likely to be guaranteeing the outcome of their services. Ordinarily, the lawyer, the physician, and the accountant are not guaranteeing a result that can be described in a contract. Instead, they are agreeing to exercise skill and knowledge normally possessed by members of the profession in an effort to achieve goals for the clients that cannot be guaranteed. The expert testimony at trial is not based on whether or not the goals were achieved but rather whether appropriate skill and knowledge was exercised.

In the present case, on the other hand, the focus will not be on the skill or knowledge that was exercised. An

5. "[T]he cases seem to turn on the question of whether the fraud concerned the performance of contractual duties. If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties." 811 A.2d at 19.

expert will be offering testimony as to whether the final product conforms to what was promised. Contract law provides sufficient protection to customers/clients of service providers whose services are capable of being evaluated through the guarantee of a defined outcome.[6]

Most courts which have considered professional negligence claims raised against computer consultants have ruled that claims for economic loss should be governed only by contract law. The following cases decided since 1990, which I discuss in reverse chronological order, have reached this conclusion:

In *Atkins Nutritionals Inc. v. Ernst & Young LLP*, 754 N.Y.S.2d 320 (N.Y. App. Div. 2003), a claim to recover damages for malpractice in the selection and implementation of a computer system was dismissed because the courts of New York do not recognize a cause of action to recover damages for professional malpractice by computer consultants. Also see *Nielsen Media Research Inc. v. Microsystems Software Inc.*, 2002 WL 31175223 (S.D.N.Y. 2002) (unpublished opinion), where the district court, citing *Richard A. Rosenblatt & Co. v. Davidge Data Systems Corp.*, 743 N.Y.S.2d 471, 472 (N.Y. App. Div. 2002), and *RKB Enters Inc. v. Ernst & Young*, 582 N.Y.S.2d 814, 816 (N.Y. App. Div. 1992), ruled that the

---

6. Illinois case law restricts the scope of professional negligence actions by applying the economic loss doctrine to actions against service providers except where the adequacy of the professional services is not usually measured by what was achieved. Thus, while Illinois courts apply the economic loss doctrine to bar a client's professional negligence claim against an architecture firm, they do not apply this doctrine to professional negligence claims against attorneys and accountants. *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503 (Ill. 1994).

courts of New York do not recognize a cause of action for computer malpractice by computer consultants.

In *Heidtman Steel Products Inc. v. Compuware Corp.,* 2000 WL 621144 (N.D. Ohio 2000) (unpublished opinion), a manufacturer that contracted with the defendant to develop a computer system could not maintain a professional malpractice action. The court, applying Michigan law, cited case law which had disallowed claims against defendants in other occupations, even though they involved great skill, because they were not professions as the term is used doctrinally. According to the court, under Michigan case law professional negligence is subject to a limited common-law definition.

In *UOP v. Andersen Consulting,* 1997 WL 219820 (Conn. Super. Ct. 1997) (unpublished opinion), the Connecticut court, applying Illinois law, did not permit a professional negligence action to be maintained against a computer consultant. The court compared services provided by lawyers and accountants with those provided by architects and computer consultants. A contract between a lawyer or an accountant and the client regards general matters; lawyers and accountants must make their own decisions regarding significant matters; and the decisions which they make are not necessarily dependent on the terms of the contract they executed with their client. The duties of a computer consultant, on the other hand, can be defined in a contract; the client can specify what the end product should be able to do, what information it should process, what it should produce, and how data should be manipulated. The job of computer consultant does not involve extracontractual duties which arise from the traditional responsibilities lawyers and accountants owe to their clients.

In *Arthur D. Little International Inc. v. Dooyang Corp.,* 928 F. Supp. 1189 (D. Mass. 1996), the court, citing Massachusetts case law which applies the economic loss rule to permit parties to a contract to allocate their risks, ruled that it would not extend the case law recognizing professional malpractice claims to independent computer consultants.

In *Columbus McKinnon Corp. v. China Semiconductor Co.,* 867 F. Supp. 1173 (W.D.N.Y. 1994), the court ruled that there was no basis in law for extending the doctrine of professional malpractice to independent computer consultants. "To lift the theory of malpractice from its narrow origin of personal, professional services to a lay patient or client and apply it to the law of commercial contracts would obfuscate the necessary boundaries of these two areas of law." *Id.* at 1182-83. (citation omitted)

In that case, the court considered three phases of a relationship between the plaintiff and a third-party defendant (Newman). In phase one, Newman designed a computer control board and its various components. In phase two, Newman rendered advice on the selection of an alternate manufacturer. Phase three involved an after-the-fact trouble-shooting role that Newman undertook. All phases were performed pursuant to a contract. The court stated that as to all phases of the relationship, public policy does not warrant the imposition of a duty upon Newman to exercise reasonable care independent of the contractual duties:

"Primarily, this is so because of the nature of his services—an unincorporated consultant engaged in rather impersonal and relatively unregulated (compared to many

other industries) field of computer design. Also, the nature of his relationship with CM was arms-length and, while he may have been vested with a certain degree of responsibility, his duties were not affected by any significant public interest. If liability exists, it is purely contractual. Actually, public policy weighs against allowing tort liability considerations to interfere with the ordering of private contractual relationships in many instances, this being one of them. Tort law is premised primarily upon the public policy of making the injured party whole, while contract law is meant to facilitate primarily economic exchange and is premised upon the ordering of private affairs by the parties involved. To infuse the current controversy with tort law, allowing it to further encroach upon private bargain-for relationships, would only upset the necessary order and predictability upon which the business world relies." *Id.* at 1183-84. (citations omitted)

In *Hospital Computer Systems Inc. v. Staten Island Hospital,* 788 F. Supp. 1351 (D.N.J. 1992), the court rejected the argument that computer consultants are professionals in the same sense as doctors, lawyers, accountants and others who are held to a higher standard of care under the law. A professional is distinguished by the requirements of extensive formal training and learning, admission to practice by a qualifying licensure, a code of ethics, a system for discipline, and an obligation of its members to conduct themselves as members of a learned, disciplined, and honorable occupation. The court said:

"Professionals may be sued for malpractice because the higher standards of care imposed on them by their profession and by state licensing requirements engen-

ders trust in them by clients that is not the norm of the marketplace. When no such higher code of ethics binds a person, such trust is unwarranted. Hence, no duties independent of those created by contract or under ordinary tort principles are imposed on them." *Id.* at 1361.

Rapidigm also relies on Raymond T. Nimmer, *The Law of Computer Technology* §9:30 (2002), which contends that malpractice claims against computer consultants should not be recognized because of the absence of a standard of the profession:

"Most practitioners in computer consulting, design, and programming do not fit a model that creates malpractice liability. These businesses and 'professional' parties clearly engage in complex and technically sophisticated activities. Computer programmers commonly define themselves as 'professionals.' Yet, despite the complexity of the work, computer programming and consultation lack the indicia associated with professional status for purposes of imposing higher standard of reasonable care. While programming requires significant skill and effective consultation requires substantial business and technical knowledge, the ability to practice either calling is not restricted or regulated at present by state licensing laws. If anything, programming skills have proliferated throughout the general public during the past decade and become less, rather than more, the exclusive domain of a profession specially trained and regulated to the task. Unlike traditional professions, while practitioner associations exist, there is no substantial self-regulation or standardization of training within the programming or consulting professions." (Rapidigm's appendix to brief, exhibit 11.)

*Bridgestone/Firestone Inc. v. Cap Gemini America Inc.,* 2002 WL 1042089 (Del. Super. Ct. 2002) (unpublished opinion), is the only decision which the parties cite, rendered since 1990, that supports ATM's position. In this case, the Delaware court, applying Tennessee law, ruled that a computer consultant is a professional under the Restatement (Second) of Torts §299A. The court did so because Tennessee has broadly construed section 299A to include all professions and trades, including precision machinists, carpenters, and blacksmiths. In footnote 13 at *4, the opinion refers to the case law of other jurisdictions that reaches the opposite result, as well as *Diversified Graphics Ltd. v. Groves,* 868 F.2d 293 (8th Cir. 1989), applying Missouri law and holding a computer consultant to the standards of a professional.

For the reasons that I have stated, an expanded reading of section 299A to cover any providers of specialized services, such as computer consultants, is inconsistent with the development of the case law allowing parties to commercial transactions to define by written agreement the obligations of the parties and the remedies for violations of these obligations. I am not aware of any justification for creating an exception to this approach for those service providers whose obligations to their customers/clients have traditionally been governed by the language within a contract.

For these reasons, I enter the following order of court:

## ORDER

On July 10, 2003, it is hereby ordered that plaintiff's preliminary objections to the counts within defendant's counterclaim of fraud, misrepresentation, and professional negligence are sustained and these claims are dismissed.